# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **JEFFREY DUNBAR REIFF,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL NO. 08-CV-5963** |
| | : | |
| **CHAD T. MARKS, BOROUGH OF** | : | |
| **WEST READING, EDWARD** | : | |
| **FABRIZIANI, and WEST READING** | : | |
| **BOROUGH POLICE DEPARTMENT** | : | |
| **Defendants.** | : | |
| | : | |

## MEMORANDUM OPINION & ORDER

**Rufe, J.**                                                                         **February 23, 2011**

In this action brought under 42 U.S.C. § 1983, Plaintiff Jeffrey Dunbar Reiff ("Reiff")

seeks damages for injuries allegedly sustained during an investigatory stop. Before the Court are

Defendants' Motion for Summary Judgment and Statement of Undisputed Facts [doc. no. 34],

Plaintiff's Response [doc. no 37] and Plaintiff's Counter-Statement of Facts [doc. no. 35]. For

the reasons set forth below, Defendants' Motion will be denied in part and granted in part.

### I. BACKGROUND[1]

This case arises from a January 5, 2007 investigatory stop of the Plaintiff by

Defendant Officer Marks ("Ofc. Marks"). During the stop, Officer Marks used his TASER

against Reiff four times. Reiff now brings claims of excessive force, assault, false imprisonment,

and failure to train against Ofc. Marks, the Borough of West Reading ("the Borough") and Chief

Edward Fabriziani ("Chief Fabriziani").

---

[1] Unless specifically noted, these facts are undisputed by the Parties.

1

## A.   FACTS RELATING TO PLAINTIFF'S ASSAULT, EXCESSIVE FORCE, AND FALSE IMPRISONMENT CLAIMS AGAINST OFFICER MARKS.

Reiff was driving alone in his motor vehicle in the Borough when Ofc. Marks, a Borough police officer, activated his patrol car lights and sirens in an attempt to stop Reiff for a traffic violation.[2]  Reiff did not stop his vehicle immediately, but instead drove, without speeding, for another thirty to sixty seconds, before stopping in a parking lot.[3]  Reiff does not dispute that Ofc. Marks was justified in detaining him for stopping beyond a marked stop line at a traffic signal in violation of 75 Pa. Cons. Stat. §3323.[4]  The parties disagree, however, on when Ofc. Marks turned on his patrol lights and sirens,[5] whether Reiff engaged in evasive driving maneuvers by refusing to pull over,[6] or if Reiff failed to stop at a second stop sign during the pursuit.[7]  It is undisputed, however, that after Ofc. Marks turned on his emergency lights and sirens, Mr. Reiff proceeded several blocks, making a right, two lefts, and another right before finally coming to a stop.[8]  During his pursuit of Reiff, Ofc. Marks called dispatch for back up.[9]

Upon stopping, Reiff exited his car and walked towards Ofc. Marks's car.[10]  When

---

[2] Pl.'s Counter-Statement of Undisputed Material Facts ¶¶ 12, 208, 210 (hereinafter "Pl.'s C.S.); Defs.' Statement of Undisputed Material Facts (hereinafter "Defs.' Stmt.).

[3] Defs.' Stmt. ¶ 3; Pl's Br. in Opp'n to Mot for Summ. J. at 8 (hereinafter "Opp'n").

[4] Pl.'s C.S. ¶ 3.

[5] Marks Dep. at 193; Reiff Dep. at 76–79.

[6] Defs.' Stmt. ¶ 37; Pl.'s Resp. ¶ 37.

[7] Defs.' Stmt. ¶ 20; Pl.'s Resp. ¶ 20.

[8] Defs.' Stmt ¶ 19; Pl.'s Resp. ¶ 19.

[9] Marks Dep. 196.

[10] Marks Dep. 91.

Ofc. Marks exited his patrol vehicle, he drew his service weapon, but after ten to fifteen seconds,[11] he holstered it in favor of his TASER because he did not see Reiff with a weapon and believed that Reiff would not attack him.[12] When Reiff was approximately fifteen feet away from Ofc. Marks, Reiff saw Ofc. Marks's gun, turned around, and began walking away from Ofc. Marks.[13] The Parties disagree as to what occurred next. Ofc. Marks claims he commanded Reiff to stop and get on the ground, and repeatedly warned him that he would be tasered if he did not stop.[14] Reiff responded by giving Ofc. Marks the middle finger and telling him to "f--- off" as he walked away toward "some building."[15] Reiff, on the other hand, claims that he could not discern what Ofc. Marks was screaming at him and walked away because he was afraid that Ofc. Marks was going to shoot him.[16]

Although Reiff was not free to leave,[17] he walked away toward a nearby building.[18] Ofc. Marks did not want to follow Reiff into the building, nor allow Reiff to enter it while he waited for back up, because he believed doing so would lead to a different, dangerous,

---

[11] Defs.' Stmt. ¶ 22–23; Pl.'s Resp. ¶ 22–23.

[12] Defs.' Stmt. ¶ 46; Pl.'s Resp. ¶ 46.

[13] Reiff Dep. 96.

[14] Defs.' Stmt. ¶¶ 23, 32–33.

[15] Defs.' Stmt ¶¶24, 38.

[16] Reiff Dep. at 101–05.

[17] Defs.' Stmt. ¶ 28; Pl.'s Resp. ¶ 28.

[18] Defs' Stmt. ¶¶ 23, 38; Pl.'s Resp. ¶¶ 23, 38.

and unpredictable situation.[19]  To stop Reiff, Ofc. Marks fired his TASER[20] at him from a

distance of ten to fifteen feet;[21] the shot hit Reiff, who seized up, fell face-first on the macadam

and suffered a facial laceration.[22]

While Reiff lay face down, Ofc. Marks tased[23] him three more times—the acts

that form the basis of Reiff's complaint.  Ofc. Marks claims that he fired his TASER the second

time because his repeated commands for Reiff to stay on the ground and put his hands behind his

back were met with physical and verbal resistance.[24]  That TASER shot was also (allegedly) met

with resistance: Ofc. Marks claims that Reiff tried to get off the ground, refused to be

handcuffed, attempted to remove the TASER probes from his back, and repeatedly told Ofc.

Marks to "f--- off."[25]

---

[19] Defs.' Stmt. ¶¶ 39, 63, 69.

[20] Ofc. Marks used an X26 TASER to subdue Marks.  The X26 TASER is "[a]n electro-muscular disruption (EMD) weapon that utilizes compressed nitrogen to shoot two small probes up to 21 feet. These probes are connected to the weapon by high voltage insulated wire.  When the probes make contact with the subject, they transmit an electrical pulse along the wires and into the body through up to two inches of clothing.  The probes do not have to penetrate the flesh or cause bodily harm to be effective."  Pl.'s Ex. H at 1.

[21] Defs.' Stmt. ¶ 27; Pl.'s Resp. ¶ 27.

[22] Defs' Stmt. ¶¶ 49–50; Pl.'s Resp. ¶¶ 49–50.

[23] Although TASER is an acronym for Thomas A. Swift Electronic Rifle, it is commonly abbreviated and used as a verb ( either "tase," "tased," "tasing," or "taser," "tasered," "tasering").  Both forms are used by courts.  Compare Shultz v. Carlisle Police Dep't., 706 F. Supp. 2d 613, 619 (M.D. Pa. 2010) ("tasered") with Wargo v. Municipality of Monroeville, 646 F. Supp. 2d 777, 783 ("tasing"). Webster's Online Dictionary, however, defines "tase" as a transitive verb that means "to shoot with a Taser gun."  See Merriam Webster's Online Dictionary at http://www.merriam-webster.com/dictionary/tase (last visited February 14, 2011).  Therefore, we adopt the verb "tase" to refer to the act of stunning an individual with a TASER.

[24] Defs.' Stmt. ¶ 50–51.

[25] Defs.' Stmt. ¶¶ 51, 60.

According to Ofc. Marks, he tased Reiff twice more before Reiff finally submitted to the commands by putting his hands behind his back to be handcuffed.[26] Reiff allegedly remained defiant and aggressive toward the Emergency Medical Services personnel called to the scene, refusing medical care and telling them not to touch him.

Ofc. Marks believed that Reiff was under the influence of alcohol, but did not want to administer a breathalyzer because of his combative behavior.[27] Reiff was taken to the Berks County DUOS Processing Center and then to a hospital.[28] Reiff refused to consent to blood testing at the DUOS processing center. After the incident, Reiff was charged with driving under the influence of alcohol and failing to observe a traffic control device.[29] He was later acquitted of both charges.[30] He was also charged with fleeing and eluding the police; this charge was later dropped.[31]

The West Reading Police Department ("Department") espouses the philosophy of using a minimum amount of force to control a combative person.[32] Under that policy, the TASER, which is issued by the Department,[33] should be used when other tactics are ineffective

---

[26] Defs.' Stmt. ¶¶ 60, 63, 65, 67.

[27] Defs.' Stmt. ¶ 48.

[28] Reiff Dep. at 56–57.

[29] Pl.'s Resp. ¶¶ 2–3.

[30] Pl.'s Resp. ¶ 4.

[31] Defs.' Stmt. ¶ 42; Pl.'s Resp. ¶42.

[32] Defs.' Stmt. ¶ 14; Pl.'s Resp. ¶ 14; Pl.'s Ex. H. at 1.

[33] Marks Dep. at 142.

and it is unsafe for an officer to come into close proximity of a suspect.[34]  The TASER may be used to subdue individuals who pose an immediate risk to themselves or others, or to safely effect an arrest.[35]

Ofc. Marks asserts that he was following Department policy in his encounter with Reiff[36] because Reiff ignored repeated commands and warnings,[37] attempted to leave without permission,[38] and because Ofc. Marks believed the situation would have become dangerous if Reiff had been permitted to enter any of the nearby buildings.[39]  Ofc. Marks used his TASER instead of approaching Reiff with a baton[40] because he thought Reiff was much larger than him and he was unsure if Reiff, who had already displayed combative behavior, might assault him, steal his gun, or attack him with a hidden weapon in response to physical contact.[41]  Ofc. Marks believes that he used all available reasonable alternatives before initially tasing Reiff,[42] and asserts that his subsequent uses of the TASER followed Department policy because Reiff would not submit to arrest.[43]  Although Reiff was on the ground after the initial TASER shot, Ofc.

---

[34] Defs.' Stmt. ¶ 14; Pl.'s Resp. ¶ 14.

[35] Defs' Stmt. ¶ 14; Pl.'s Resp. ¶ 14.

[36] Defs.' Stmt. ¶ 35.

[37] Defs.' Stmt. ¶¶ 14, 40.

[38] Defs.' Stmt. ¶¶ 28, 43.

[39] Defs.' Stmt. ¶¶ 39, 63.

[40] Defs.' Stmt. ¶ 30.

[41] Defs.' Stmt. ¶¶ 41, 45.

[42]  Defs.' Stmt. ¶¶ 51–53, 60, 65, 67.

[43] Defs.' Stmt. ¶ 63.

Marks continued to TASER him because he believed that Reiff would knock him over if he attempted to physically restrain Reiff by placing his foot on Reiff's back.[44] He claims that his actions were consistent with his TASER training.[45]

Reiff disputes the following aspects of Ofc. Marks's description of the events leading up to and occurring during the tasing: (1) that Ofc. Marks's belief that tasing was the "minimum amount of force necessary" was reasonable;[46] (2) that he is physically larger and had the potential to harm and overpower Ofc. Marks;[47] (3) that he could have pulled a gun on Ofc. Marks;[48] (4) that walking away from Ofc. Marks created an "out of control" situation;[49] (5) that Ofc. Marks could not make an arrest unless Reiff remained on the ground;[50] and, (6) that because of his size and demeanor, Ofc. Marks would have been knocked over if he had placed his foot on Reiff's back.[51]

Plaintiff's expert regarding police operations opined that Ofc. Marks exerted unnecessary and excessive force in pointing his gun at Reiff after exiting his car in the parking lot.[52] In his view, although Ofc. Marks's initial use of a TASER on Reiff was a viable-force

---

[44] Defs.' Stmt. ¶¶ 53–54, 61.

[45] Defs.' Stmt. ¶ 62.

[46] Pl.'s Resp. ¶ 28.

[47] Pl.'s Resp. ¶¶ 30–31.

[48] Pl.'s Resp. ¶ 45.

[49] Pl.'s Resp. ¶ 63.

[50] Pl.'s Resp. ¶ 53.

[51] Pl.'s Resp. ¶ 61.

[52] Defs.' Mot. for Summ. J. Ex. L at 6.

alternative considering the totality of the circumstances, Ofc. Marks's additional TASER uses after Reiff was able to comply with verbal commands and could be safely handcuffed were unnecessary and unreasonable.[53]

## B.    FACTS RELATING TO PLAINTIFF'S FAILURE-TO-TRAIN CLAIMS AGAINST DEFENDANTS FABRIZIANI AND THE BOROUGH OF WEST READING.

The Department's use of TASERs has been approved by the Borough's Mayor and Council,[54] and is governed by a seven-page TASER Policy, which is included in the Department's Police Policy Manual.[55] The TASER Policy was written in consultation with the TASER manufacturer and other police departments.[56] Borough police officers are neither required to memorize the TASER Policy, nor read it on a regular basis.[57] The same is true of the Policy Manual.[58] There is no written test to evaluate the officers' understanding of the Policy Manual.[59]

There are several provisions of the TASER Policy that Chief Edward Fabriziani ("Chief Fabriziani") allows his Department to ignore in practice. For instance, the TASER policy requires officers to photograph the TASER contact spot, and enter the photographs and

---

[53] Defs.' Mot. for Summ. J. Ex. L at 7, 8.

[54] Fabriziani Dep. at 88.

[55] Pl.'s C.S. ¶ 59.

[56] Fabriziani Dep. at 165–66.

[57] Pl.'s C.S. ¶¶ 60–61.

[58] Pl.'s C.S. ¶¶ 56, 151–54.

[59] Pl.'s C.S. ¶¶ 109–10.

expended TASER cartridges into evidence.[60]  Ofc. Marks, however, did not take photographs at

the scene of the incident.[61]  In addition, although Ofc. Beighly (the Department's TASER

Instructor) interviewed the back-up officers who arrived after the tasings, he did not write a

report or evaluate whether Reiff complied with the TASER Policy during the incident.[62]  Instead,

Ofc. Beighly simply told Ofc. Marks that his TASER use on Reiff was "fine."[63]  Moreover,

although the TASER policy includes a sign-out sheet for officers to complete when taking a

TASER on patrol, the Chief allows the officers to simply note that they carried a TASER on their

daily shift logs.[64]

Although Ofc. Marks had worked as a part-time officer for a year before being

hired as a full-time officer for the Department, he did not see a copy of the Policy

Manual—which apparently governs the conduct of all officers—until he started working full-

time.[65]  Neither the Policy Manual nor the TASER Policy requires Borough police officers to be

retrained after their initial TASER training.

Ofc. Beighly used the manufacturer's lesson plan and a Power Point curriculum to

train Ofc. Marks on the X26 TASER in 2006.[66]  Although Ofc. Beighly does not deviate from the

manufacturer's lesson plan, his training sessions have never been reviewed by other TASER

---

[60] Pl.'s C.S. ¶¶ 95–96.

[61] Pl.'s C.S. ¶ 203.

[62] Pl.'s C.S. ¶¶ 124–25.

[63] Pl.'s CS ¶ 190.

[64] Pl.'s C.S. ¶¶ 186–88.

[65] Pl.'s C.S. ¶¶ 138, 144–45.

[66] Pl.'s C.S. ¶¶ 100, 105.

instructors, or attended by Chief Fabriziani, representatives of the Borough, or the manufacturer.[67] The training consists of a video, instruction about how the TASER works and is used, practice firing a TASER, and tasing participants.[68] At the conclusion of the training, Ofc. Marks took and passed a written test.[69]

Ofc. Marks was recertified on TASER usage by Ofc. Beighly in 2007, but the recertification consisted solely of Ofc. Beighley informing Ofc. Marks that there were no new developments regarding the TASER. Although Ofc. Beighly was unable to confirm that further recertifications occurred, Ofc. Marks claims that he was recertified in April of 2008 and 2009.[70] It is the Department's practice for Ofc. Beighly to annually reissue police officers a new certificate of TASER proficiency.[71]

Plaintiff's expert evaluated the Department's TASER Policy and found it deficient in several respects.[72] In particular, the policy does not direct its officers to taser the subject as few times as possible and no longer than necessary to accomplish the "legitimate operational objective."[73] Additionally, the policy fails to inform officers that a subject who has been tased may not be able to respond to commands during or immediately after being tased.[74]

---

[67] Pl.'s C.S. ¶ 108.

[68] Pl.'s C.S. ¶¶ 191–92.

[69] Marks Dep. at 155.

[70] Pl.'s C.S. ¶ 113; Marks Dep. at 155.

[71] Pl.'s C.S. at ¶ 119.

[72] See Pl.'s Ex. L.

[73] Pl.'s Ex. L at 8.

[74] Pl.'s Ex. L at 8.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[75] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[76] A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[77]

A moving party has the initial burden of supporting its motion by reference to evidence that is capable of being admissible in a trial.[78] If this initial requirement is satisfied, the burden shifts to the nonmoving party to "set out specific facts showing a genuine issue for trial."[79] The nonmoving party may meet this burden either by submitting evidence that negates an essential element of the moving party's claims, or by demonstrating that the movant's factual evidence is insufficient to establish an essential element of its claims.[80] The facts the nonmovant relies on for these purposes also must be demonstrated by evidence that can be admitted at trial.[81]

In considering a summary judgment motion, the Court does not weigh the

---

[75] Fed. R. Civ. P. 56(c) (2007).

[76] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[77] Id.

[78] Callahan v. A.E.V., Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999).

[79] Fed. R. Civ. P. 56(e)(2).

[80] Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986).

[81] Callahan, 182 F.3d at 252 n. 11.

evidence or make credibility determinations; moreover, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."[82]

## III. DISCUSSION

### A. QUALIFIED IMMUNITY

Ofc. Marks argues that because his actions during Reiff's arrest were reasonable and did not violate Reiff's Fourth Amendment rights, he is qualifiedly immune. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[83] Qualified immunity is an affirmative defense for which the defendants bear the burden of proof.

To determine whether a defendant has qualified immunity, the court conducts a two-part test. First, a court considers whether the facts alleged, taken in the light most favorable to the injured party, show that the conduct violated a constitutional right.[84] Second, the court examines whether that right was "clearly established;" in other words, whether a reasonable person would know that her conduct was unlawful under the circumstances.[85] Courts have discretion to decide which of the two prongs of the qualified immunity should be addressed first

---

[82] Anderson, 477 U.S. at 255.

[83] Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (citation & quotation omitted); Bayer v. Monroe Cnty. Children and Youth Servs., 577 F.3d 186, 191 (3d Cir. 2009).

[84] See Saucier v. Katz, 533 U.S. 194, 201 (2001).

[85] Id. at 202.

in light of the circumstances in the particular case at hand.[86]

      Ordinarily, the determination of whether a defendant is entitled to qualified immunity is an objective question decided by the Court as a matter of law.[87] The inquiry turns upon the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."[88] Granting summary judgment for qualified immunity is inappropriate, however, "where there are disputed, historical facts material to the objective reasonableness of an officer's conduct."[89] Accordingly, before determining whether Ofc. Marks is entitled to qualified immunity, the Court must first examine Reiff's § 1983 claim of excessive force.

## B. EXCESSIVE FORCE

      Reiff alleges that Ofc. Marks's three subsequent TASER uses constitute excessive force in violation of his constitutional rights. Because the determination of whether the use of a TASER is reasonable is a fact-specific inquiry, courts have reached different results depending on the facts and circumstances of each case.

      Section 1983 does not create any substantive rights, but provides a remedy for the violation of federal constitutional or statutory rights.[90] Claims that law enforcement officers have

---

[86] See Pearson, 129 S. Ct. at 818.

[87] Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004).

[88] Pearson, 129 S. Ct. at 822.

[89] Hall v. Raech, 677 F. Supp. 2d 784, 799 (E.D. Pa. 2010).

[90] Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000).

used excessive force in the course of a "seizure" are analyzed under the Fourth Amendment and its 'reasonableness' standard.[91]

To state a claim for excessive force under the Fourth Amendment, Reiff must show that a seizure occurred, that the seizure was unreasonable, and that Ofc. Marks was liable for the violation.[92]  It is well-recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[93]

To evaluate the reasonableness of Ofc. Marks's actions, the Court examines the "totality of the circumstances," and adopts "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[94]  In Graham v. Connor, the Supreme Court suggested three factors to consider in evaluating reasonableness: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[95]  In addition, the Court should consider:

> (1) whether the physical force applied was of such an extent as to lead to injury; (2) the possibility that the persons subject to the police action are themselves violent or dangerous; (3) the duration of the police officers' action; (4) whether the action takes place in the context of effecting an arrest; (5) the possibility that the suspect may be armed; and (6) the number of persons with whom the police

---

[91] Graham v. Connor, 490 US 386, 395 (1989).

[92] Berg v. Cnty of Allegheny, 219 F.3d 261, 269 (3d Cir. 2000).

[93] Graham, 490 US at 396.

[94] Id. at 396–97; Carswell, 381 F.3d at 240.

[95] Graham, 490 U.S. at 396.

officers must contend at one time.[96]

In a handful of recent cases involving TASER use within the Third Circuit, law enforcement defendants have prevailed in their motions for summary judgment. In each of those cases, TASER use was reasonable to overcome a suspect's resistance to arrest because the Plaintiff attempted to flee, appeared to threaten officer safety, or was either armed or suspected to be armed.[97] It is more common, however, that an officer's motion for summary judgment on a plaintiff's excessive force claim is denied because genuine issues of material fact exist after resolving all discrepancies in favor of the plaintiff.[98]

Ofc. Marks argues that his actions were reasonable given the situation and notes Plaintiff's concession that the initial use of the TASER was appropriate under the totality of the

---

[96] Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997); see also Couden v. Duffy, 446 F.3d 483, 497 (3d Cir. 2006); McNeil v. City of Easton, 694 F. Supp. 2d 375, 392 (E.D. Pa. 2010).

[97] See Wargo, 646 F. Supp. 2d at 784–85 (W.D. Pa. 2009) (initial taser use was reasonable because it was undisputed that the suspect, known to be suicidal and armed, never complied with instructions to stop approaching the officer and drop his gun; continued TASER use was not excessive because it was reasonable to think that the suspect still posed a threat due to his combative nature, prior refusal to disarm, suicidal state, and previous ineffectiveness of the TASER); Hudson v. Goob, No. 07-cv-1115, 2009 WL 789924, at *8 (W.D. Pa. 2009) (no disputed issues where Plaintiff did not submit any evidentiary motions after summary judgment motion was submitted); Armbruster v. Marguccio, No. 05-344J, 2006 WL 3488969, *6 (W.D. Pa. Dec. 4, 2006) (partial grant of summary judgment proper when man who repeatedly drove away from the police after being pulled over was tased for not opening his car door immediately afer finally stopping his car; genuine issue of material fact existed about the propriety of the initial tasing, but not about the subsequent tasings).

[98] See, e.g., Shultz, 706 F. Supp. at 628 (videotape of tasing incident created genuine issue of material fact about whether tasing was excessive force); Wilhere v. Delaware Cnty, no. 09-22, 2010 WL 1381664, at *3–11, *20–21 (E.D. Pa. Apr. 1, 2010) (plaintiff presented evidence from which a reasonable jury could conclude that deputies' actions constituted excessive force); Buchanan v. West Whiteland Twp., No. 08-cv-462, 2009 WL 879038, at *8 (E.D. Pa. Mar. 31, 2009) (several issues of material fact were in dispute); Caliguiri v. City of Pittsburgh, No. 07-1133, 2009 WL 1546325, at *3–4 (W.D. Pa. June 2, 2009) (same); Marshall v. Penn Twp., No. 08-90, 2009 WL3241873, *11 (W.D. Pa. Oct. 6, 2009) (same); Boyd v. Kissinger, No. 06-5628, 2008 WL 2550584, *6 (E.D. Pa. June 25, 2008) (same).

circumstances.[99]  In Ofc. Marks's view, the second, third, and fourth TASER discharges were justified because Reiff resisted arrest by failing to take his hands out from under the front of his body as ordered, refusing to obey Ofc. Marks's commands, and attempting to remove the TASER probes from his back.[100]

Plaintiff claims, in part, to have no recollection of the incident.[101]  He argues, however, that continued application of the TASER was unnecessary because the first TASER shot effected Ofc. Marks's goal of seizing Plaintiff.[102]  Plaintiff contends that the totality of the circumstances weighs in favor of finding that Ofc. Marks used excessive force by tasing him more than once.  Specifically, Plaintiff notes that: (1) the severity of the suspected crime was, at best, misdemeanor driving under the influence; (2) Plaintiff did not pose an immediate threat of harm, and was, at worst, "loud and disobedient"; (3) Plaintiff did not resist arrest; (4) no facts

---

[99] Defs.' Borough of West Reading, Chief of Police Edward Fabriziani and Officer Chad Marks Mem. of Law in Supp. of their Mot. for Summ. J. at 7 ("Defs.' Mem. of Law") (citing Ex. L, Expert Report of January 28, 2010 at 7).

[100] Id. at 10.

[101] Plaintiff's deposition testimony conflicts with his Response to Defendant's Statement of Undisputed Facts.  In his deposition, Plaintiff repeatedly claimed not to remember any events that transpired after the initial tasing.  In his response, however, Plaintiff repeatedly denies—and concedes—facts that he would have no way of knowing if, indeed, he was unconscious for the subsequent tasings.  Since an assertion in a summary judgment affidavit cannot create an issue of material fact by contradicting a deposition, this Opinion & Order adopts Reiff's statement that he does not remember any of the events after the first tasing.  See, e.g., Czubaj v. Ball State Univ., 107 F. App'x. 664, 666–67 (7th Cir. 2004) ("Czubaj's assertion in her summary judgment affidavit cannot create a disputed fact because it contradicts her deposition testimony. . . . Thus, Czubaj failed to demonstrate a genuine issue of material fact sufficient to preclude the entry of summary judgment for the University."); see also Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir.1991) ("When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists. '[T]he objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit.'").

[102] Opp'n at 8.

support the possibility that Plaintiff was violent or dangerous; (5) the duration of the incident was very brief; (6) Ofc. Marks did not attempt to arrest Plaintiff until after tasing him four times; (7) Ofc. Marks did not believe Plaintiff was armed; and (8) Ofc. Marks had to contend only with the Plaintiff.[103]

Based on an independent assessment of the totality of the circumstances, the evidence of record, and drawing all inferences in favor of the Plaintiff, there is evidence from which a reasonable jury could conclude that Ofc. Marks's actions constituted excessive force. In particular, the Parties dispute the extent to which Reiff resisted arrest after the initial tasing. Ofc. Marks contends that Reiff attempted to flee and elude the police by refusing to stop his vehicle upon being signaled to do so and walking away from Ofc. Marks toward his garage.[104] Reiff, on the other hand, claims that he only drove an additional thirty to sixty seconds at a lawful speed to arrive at the parking lot[105] and was not engaging in evasive driving maneuvers.[106] Ofc. Marks also claims that Reiff physically resisted arrest by refusing to stay on the ground and put his hands behind his back.[107] Although Reiff claims that he does not recall anything from the incident after the initial tasing, Ofc. Marks's testimony and the testimony of eyewitness Michael Leagans, a former police officer, raise an issue of material fact as to whether Reiff resisted arrest. Although Leagans could not see Reiff's hand after he fell to the ground, he testified that "from

---

[103] Id. at 9–14

[104] Defs.' Stmt. ¶¶ 3, 38–39.

[105] Opp'n at 11.

[106] Reiff Dep. at 56–57.

[107] Defs.' Stmt. ¶¶ 51–52, 60, 65, 67.

the way [Ofc. Marks] was behaving, [Reiff] appeared to . . . have been compliant."[108]  He also

testified that Ofc. Marks never attempted to come closer to Reiff, and maintained a distance of 10

to 15 feet from Reiff until his back up support arrived.  Although Ofc. Marks testified that Reiff

attempted to push himself up after initially falling, and to pull the probes out of his back, he

admitted that he did not feel physically threatened by Reiff, and never believed that Reiff was

carrying a weapon.

       The Parties also disagree about whether this action occurred in the context of

effecting an arrest.  Ofc. Marks argues that the entire parking lot encounter took place within the

context of effecting an arrest, and that the subsequent tasings were necessary because Reiff

refused to stay on the ground and put his hands behind his back to be handcuffed.[109]  But Reiff

argues that Ofc. Marks did not attempt to arrest him until after the final tasing, rendering the final

three jolts unnecessary and excessive.[110]

       In addition, the Parties dispute whether Ofc. Marks believed there was a

possibility that Reiff was armed.  Ofc. Marks argues that although he did not see a gun or weapon

on Reiff, there was a possibility that Reiff had a weapon hidden on his person.[111]  Ofc. Marks was

unable to confirm whether Reiff was or was not armed until after he was handcuffed.[112]  Reiff

counters that he was unarmed and was not observed making any furtive movements.[113]  Reiff also

---

[108] Pl.'s Ex. M at 55.

[109] Defs.' Mem. of Law at 10.

[110] Opp'n at 13.

[111] Defs.' Stmt. at ¶¶ 22–23, 45.

[112] Defs.' Mem. of Law at 10.

[113] Opp'n at 13.

points to Ofc. Marks's admission that he switched from his gun to his TASER because he did not see a weapon on Reiff.[114]

Based on this evidence, a jury could conclude that Ofc. Marks used excessive force by repeatedly tasing Reiff after he collapsed to the ground. Accordingly, Ofc. Marks is not entitled to qualified immunity or summary judgment on this claim. This ruling, however, is without prejudice, and the defendants may raise a qualified immunity defense after the disputed issues of fact are resolved.

## C. ASSAULT

The Court cannot decide summary judgment on Plaintiff's assault claim until it is determined whether Ofc. Marks's final three TASER applications were excessive. Under Pennsylvania law, an assault occurs "when one acts with the intent to put another in reasonable and immediate apprehension of a harmful or offensive contact, and that act does cause such apprehension."[115] A battery occurs "whenever the violence menaced in an assault is actually done, though in ever so small degree, upon the person."[116] In making a lawful arrest, police officers are permitted to use such force as is necessary under the circumstances to effectuate the arrest.[117] "The reasonableness of the force used in making the arrest determines whether the

---

[114] Defs.' Stmt. ¶¶ 22–23; Pl.'s Resp. ¶¶ 22–23.

[115] See Zimmerman v. Schaeffer, 654 F. Supp. 2d 226, 255 (M.D. Pa. 2009).

[116] Maloney v. City of Reading, No. 04-5318, 2006 WL 305440, at *25 (E.D. Pa. Feb. 8, 2006).

[117] Renk v. City of Pittsburgh, 537 A.2d 68,76 (Pa. 1994).

police officer's conduct constitutes an assault."[118]

Reiff claims that Ofc. Marks assaulted and battered him by tasing him four times.[119] Ofc. Marks argues, however, that if the Court determines that the three subsequent TASER applications do not constitute excessive force, then Plaintiff cannot succeed on his assault claim. Because the issue of excessive force is dispositive to the assault claim, and because there is a disputed issue of material fact about whether Ofc. Marks used excessive force, summary judgment on Reiff's assault claim is inappropriate at this time.

## D.    FALSE IMPRISONMENT

Ofc. Marks is entitled to summary judgment on Plaintiff's false imprisonment claim because probable cause existed to make the arrest, and "an arrest based on probable cause cannot become the source for a claim for false imprisonment."[120]

False imprisonment occurs when "a person has been (1) arrested or restrained (2) without adequate legal justification."[121] In Pennsylvania, an individual may be arrested without a warrant when he or she commits a misdemeanor in the presence of a police officer.[122] An individual has committed a second-degree misdemeanor if he "willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle, when

---

[118] Id.

[119] Opp'n at 35.

[120]  Groman v. Twp. of Manalapan, 47 F.3d 628, 634–36 (3d Cir. 1995).

[121] Perry v. Redner's Mkt., Inc., No. 09-5645, 2010 WL 2572657, at *14 (E.D. Pa. June 21, 2010); see also Gilbert v. Field, 788 F. Supp. 854, 862 (E.D. Pa. 1992).

[122] United States v. Ryan, 128 F. Supp. 2d 232, 236 (E.D. Pa. 2000).

given a visual and audible signal to bring the vehicle to a stop."[123]

Plaintiff admits that Ofc. Marks was justified in stopping him for allegedly failing to observe a traffic control (stopping beyond a marked stop line at a traffic signal).[124]  In addition, Plaintiff's expert on police policy agrees that Ofc. Marks had reasonable suspicion to stop Reiff for the alleged traffic violation.[125]  It is also undisputed that Reiff did not immediately stop his vehicle when he noticed Ofc. Marks's police lights and sirens, and instead continued driving for a few blocks for a short period of time.[126]  After Ofc. Marks activated his emergency lights and sirens, Reiff "turned right on South 6th Street . . . took a left on Cherry Street, a left onto South Avenue and [a] right onto Franklin Street."[127]  Because Reiff willfully refused to bring his vehicle to a stop after being given visual and audible signals to do so, he committed a misdemeanor in front of Ofc. Marks, thus allowing Ofc. Marks to lawfully arrest him.  As Ofc. Marks lawfully arrested Reiff, Ofc. Marks should be granted summary judgment on Reiff's false imprisonment claim.

## E.    FAILURE TO TRAIN

### 1.    Reiff's Failure-to-Train Claim Against the Borough

Reiff alleges that he was harmed by the Borough's failure to provide its police

---

[123] 75 Pa. Cons. Stat. § 3733(a) (2006).

[124] Pl.'s C.S. ¶ 3; Opp'n at 7.

[125] Defs.'s Mot. for Summ. J. Ex. L at 6.

[126] Defs.'s Stmt. ¶ 3; Opp'n at 8;Defs.' Stmt ¶ 19; Pl.'s Resp. ¶ 19.

[127] Defs.' Stmt. ¶ 19; Pl.'s Resp. ¶ 19.

officers adequate TASER training. The Borough, however, is entitled to summary judgment on Reiff's failure to train claim because it has not adopted a policy that shows deliberate indifference toward its citizens' constitutional rights.

In Monell v. Department of Social Services, the Supreme Court held that a municipality can be held liable under 42 U.S.C. § 1983, but only if the actions of its employees are carried out pursuant to a policy, custom, or practice.[128] Therefore, the Borough is liable under § 1983 if Reiff can "identify a policy or custom of the entity that caused the constitutional violation."[129]

To prevail on a failure-to-train claim, Reiff must show that the Department's TASER training procedures were inadequate due to the Borough's deliberate indifference toward its citizens' constitutional rights.[130] Deliberate indifference exists when "(1) 'the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights,' or (2) the municipality had received complaints about the same or similar constitutional violations and still failed to act."[131] The Court must examine "the adequacy of the training in relation to the tasks the employees must perform."[132] It is not enough if a plaintiff alleges that a municipality should have or could have incorporated other training programs,[133] nor

---

[128] Monell v. Dep't of Soc. Servs., 436 US 658, 690–91 (1978).

[129] A.M. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 580 (3d Cir. 2004).

[130] City of Canton v. Harris, 489 U.S. 378, 387–88 (1989).

[131] Banegas v. Hampton, No. 08-5348, 2010 WL 3766408, at *11 (E.D. Pa. Apr. 23, 2009) (citing City of Canton, 489 U.S. at 390 & n.10).

[132] City of Canton, 489 U.S. at 389–90.

[133] Id. at 391.

is it enough to show simple or even heightened negligence.[134]  "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability . . . for the officer's shortcomings may have resulted from factors other than a faulty training program."[135]  Indeed, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."[136]

Reiff claims that the Borough has failed to properly implement its TASER policy through Chief Fabriziani, who has not ensured that his police officers receive adequate instruction, training, and education on TASER use.[137]  Reiff lists seven pages of facts in an attempt to show that the Department is "rogue . . . without adequate supervision and control."[138]  His expert also contends that the TASER policy is deficient because it "does not direct officers to energize the subject the least number of times and no longer than necessary" and "does not make [Ofc.] Marks aware that an energized Mr. Reiff may not be able to respond to commands during or immediately following exposure."[139]

The Borough, however, asserts that discovery clearly shows that the Department trains its officers on the TASER.[140]  It is undisputed that Ofc. Marks received a day-long training on the TASER from Ofc. Beighly in April of 2006, which consisted of: 1) watching a video; 2)

---

[134] Berg, 219 F.3d at 276.

[135] City of Canton, 289 U.S. at 390–91.

[136] Id. at 391.

[137] Opp'n at 34.

[138] Opp'n at 26–33, 33.

[139] Defs.' Mot. Summ. J. Ex. L at 8.

[140] Defs.' Mem. of Law at 16.

learning how the TASER works; 3) reviewing the Borough's TASER policy; 4) taking a written exam; 5) firing a TASER, and being subjected to a TASER.[141]  It is also undisputed that the curriculum used during Ofc. Beighley's TASER training comes from the manufacturer, and that Ofc. Beighly recertifies the Department's police officers on a yearly basis.[142]  The record, moreover, does not mention any history of problems regarding Borough officers' TASER use, and Ofc. Marks never shot a person with a TASER until the incident with Reiff.[143]

Furthermore, although the Department's TASER policy does not explicitly order an officer to tase a subject the fewest number of times and no longer than necessary, it reminds its officers of Department policy to use "the minimum amount of force to control a combative person."[144]  The TASER training Ofc. Beighly received from the TASER's manufacturer teaches officers to only apply the necessary number of TASER cycles and informs them that some individuals may not be able to comply with verbal commands after being tased.[145]  Ofc. Beighley does not deviate from the Manufacturer's curriculum when he trains Borough officers.[146]

There is no evidence that the Borough showed a deliberate indifference to the constitutional rights of its citizens.  The only disputed facts show nothing more than possible imperfections in the Borough's training of its police officers.  Reiff has not alleged or established that the Department has received numerous complaints about its officers' TASER use.  Nor has

---

[141] Pl.'s C.S. ¶¶ 91–92.

[142] Pl.'s C.S. ¶¶ 100, 105.

[143] Pl.'s C.S. ¶ 197.

[144] Defs.' Mot. for Summ. J. Ex. H. at 1.

[145] Defs.' Mot. for Summ. J. Ex. K at 180, 177.

[146] Pl.'s C.S. ¶¶ 100, 105.

he established that the need for more or different training was obvious and the failure to implement such training would likely result in the violation of constitutional rights. Moreover, the TASER policy does address the need to use as few TASER applications as possible to control a combative subject, if not in the exact terminology preferred by Plaintiff's expert. Therefore, because Reiff has failed to prove deliberate indifference, the Borough is entitled to summary judgment on Reiff's failure to train claim.

2. *Reiff's Failure-to-Train Claim against Police Chief Fabriziani*

Reiff alleges that Chief Fabriziani adopted a policy, custom and/or practice of providing his police officers inadequate training regarding the use of the TASER, and that Reiff suffered direct harm as a result of that failure to train. Chief Fabriziani, however, is entitled to summary judgment on Reiff's failure-to-train claim because Reiff fails to present evidence of specific acts or omissions by the Chief that created an unreasonable risk of Reiff's rights being violated.

In Sample v. Diecks, the Third Circuit established a five-part test that a plaintiff must satisfy in order to establish a claim of supervisory liability:[147]

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure, created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.[148]

---

[147] Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).

[148] Armbruster, 2006 WL 3488969, at *10 (citing Diecks, 855 F.2d at 1118).

Under the <u>Sample</u> test, "it is not enough for a plaintiff to argue that the constitutionally-cognizable injury would not have occurred if the superior had done more than he or she did."[149] Rather, the test requires Reiff to identify specific acts or omissions by Chief Fabriziani that show deliberate indifference, and a relationship between that deficiency and plaintiff's injury.[150]

Reiff points to a host of facts in an attempt to prove that Chief Fabriziani has failed to adequately supervise and control his Department. These facts include the Chief's lack of training on the TASER, the Chief's delegation of authority over all aspects of TASER policy to Ofc. Beighly, the Department's policy not to provide annual performance reviews, its lack of a policy for following-up with officers after they use a TASER while on duty, and the Chief's acquiescence to officers signing out their TASERs through a notation on their daily patrol log instead of the TASER sign-out sheet.[151]

Reiff's accusations, however, fail to consider that Chief Fabriziani delegated authority on TASER-related matters to Ofc. Beighley because Ofc. Beighley led the effort in researching and receiving training on the TASER in the year that Chief Fabriziani was active-duty military.[152] Furthermore, Chief Fabriziani has not received TASER training because his job is administrative and does not require him to be on patrol.[153] All other Department police officers receive training on the TASER.[154]

---

[149] <u>Id.</u>

[150] <u>Id.</u>

[151] Opp'n at 33–34.

[152] Fabriziani Dep. at 160, 175.

[153] Fabriziani Dep. at 161.

[154] Beighley Dep. at 59.

Ultimately, Reiff fails to present facts of a specific practice that Chief Fabrizani failed to employ that a reasonable jury could conclude created an unreasonable risk of Reiff's Fourth Amendment rights being violated. He also fails to present any facts that the Chief was aware of and indifferent to the existence of such a risk or that Ofc. Marks's alleged violation of Reiff's rights was the result of a failure by the Chief to employ a specific practice or procedure. Therefore, Chief Fabriziani is entitled to summary judgment on Plaintiff's failure-to-train claim.

### F. GENERAL NEGLIGENCE AND INTENTIONAL CONDUCT ALLEGED AGAINST JANE OR JOHN DOES.

Defendant argues that Plaintiff has failed to identify any John or Jane Does during discovery in this matter, and that Count XI should be dismissed in its entirety.[155] Plaintiff failed to address this issue in his brief. Summary judgment is thus proper on this claim.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment should be granted in part and denied in part. Ofc. Marks is not entitled to qualified immunity at this time because there are genuine disputes of material fact regarding the objective reasonableness of his TASER use. For the same reason, he is not entitled to summary judgment on Plaintiff's excessive force or assault claim. Ofc. Marks, however, is entitled to summary judgment on Plaintiff's false imprisonment claim because, as a matter of law based on undisputed facts, he lawfully arrested Reiff. Furthermore, the Borough

---

[155] Defs.' Mem. of Law at 18.

and Chief Fabrizani are entitled to summary judgment on Plaintiff's failure-to-train claims.

Finally, Plaintiff's claims against Jane or John Does must be dismissed, as Plaintiff has failed to

identify any such individuals during discovery.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

**JEFFREY DUNBAR REIFF,**

        **Plaintiff,**

    **v.**

**CHAD T. MARKS, BOROUGH OF
WEST READING, EDWARD
FABRIZIANI, and WEST READING
BOROUGH POLICE DEPARTMENT**
      **Defendants.**
_____

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**CIVIL NO. 08-CV-5963**

### ORDER

      **AND NOW**, this 23rd day of February, 2011, upon consideration of Defendants'

Motion for Summary Judgment [doc. no. 34], Plaintiffs' Opposition [doc. no. 37], and Plaintiff's

Counter-Statement of Facts [doc. no. 35] it is hereby **ORDERED** that Defendant's Motion is

**GRANTED IN PART** and **DENIED IN PART.**  Defendants' Motion for Summary Judgment is

**GRANTED** as to Counts III & IV, and **DENIED** as to Counts V–XI, for the reasons set forth in

the attached Memorandum Opinion.

      The Clerk is **DIRECTED** to mark the docket in this matter as terminating the following

Parties:  Edward Fabriziani and West Reading Borough Police Department.

      It is so **ORDERED**

                          **BY THE COURT:**

                          _____

                          **HON. CYNTHIA M. RUFE**